## Case No. 14,381.

### UNION PAC. R. CO. v. McSHANE.

[5 Chi. Leg. News, 526; 21 Pittsb. Leg. J. 1.]

Circuit Court. D. Nebraska. 1873.

TAXATION—PUBLIC LANDS—GRANT TO RAILROAD—TAX SALES.

That the United States still retains a pecuniary interest in the lands granted to the Union Pacific Railroad Company, as well as the legal title to such lands, and that the contingent right of offering these lands to actual settlers at the minimum price asked for its lands by the government forbid the state to embarrass these rights by a sale for taxes, and that such lands are not liable to be taxed by the state.

DUNDY, District Judge. This is an action brought by the Union Pacific Railroad Company against Edward C. McShane, treasurer of Douglas county, and against the treasurers of several other counties containing lands belonging to said company, to restrain the collection of taxes levied on the said lands. The bill alleges that the lands described in the several exhibits, and on which the taxes are levied, were granted by the general government to the complainant company, to aid in the construction of the Union Pacific Railroad. That the complainant has procured the issuing of patents to certain of the lands so described, known as those situate within the ten miles limit. That the general government yet retains the title to, and a pecuniary interest in, all that portion of the lands so described, situate without the ten miles limit, and within what is known as the twenty miles limit, and that the complainant is equitably entitled to receive from the government patents for said land, on the payment of the usual land office fees and the cost of surveying the same, as provided by law. That at no time to the present date has the complainant been required to select the lands, nor to pay the fees and cost of the survey as aforesaid, and that the levying of the taxes upon the lands in question was without lawful authority. The matter and facts stated in the bill are at this time uncontroverted, and must be received as absolute verity. What questions may be presented after the filing of an answer and the taking of the testimony, it is neither necessary nor proper now and here to discuss. There does not seem to be any question about the manner in which the lands were assessed, nor about the levying of the taxes, or the method of proceeding to enforce the collection of the same. I do not understand the counsel to question the regularity or correctness of these proceedings so far as formality is concerned. So far as appears by the bill and by statements of counsel, we can safely infer that the revenue laws of the state have been literally complied with by the officers whose duty it is to enforce them. But it is the right to tax the lands for any purpose and under any circumstances whatever, by state authority that is challenged and expressly denied by the complainant. Stripped of all unnecessary surroundings, it is enough to say that if the naked right to tax these lands by state authority exists at all, it is decisive of this whole controversy, and the prayer of the bill would, for that reason, be refused.

The third section of the act of congress of July 1, 1862 [12 Stat. 492], entitled "An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific Ocean, and to secure to the government the use of the same for postal, military and other purposes," and the fourth section of the amendatory act of the 2d of July, 1864 [13 Stat. 358], both of which must be taken and construed together, appropriates the alternate or odd-numbered sections of the public lands for a distance of twenty miles on each side of the railroad, for the purpose of aiding in the construction and completion

thereof. This grant, however, is not an absolute and unconditional one. Before the railroad company could acquire title to the lands it would be necessary to complete the railroad, or, at least, a section of it, in first-class style, as provided by the said acts of congress. After that the company would be required to make the selection of the lands to which it might be entitled, pay to the government the usual fees for entering and patenting, and the actual cost of surveying the same. When all these things were done, and not before, the company to be entitled to patents for the land. It is quite probable that some of these conditions have been complied with by the company, but it is absolutely certain that some of them have not, at least so far as relates to the land lying between the ten and twenty mile limit. When all the conditions precedent required of the company have been complied with, and the fact properly established, the company will be entitled to patents for the land last referred to. But the company has not yet done all that is required of it, and the result is, the United States still retains a pecuniary interest in the land, as well as the legal title to it. So long as that pecuniary interest exists, the right to enjoy it, and the remedy to protect and secure it, can not in any way be abridged or embarrassed by the action of individuals or of states. These rights and this pecuniary interest can alone be affected by the law-making power of the government; and until that power is exercised in such a manner as to secure to the state the right to tax the lands in which the government retains such an interest, it is useless to undertake to do so if such action would impair the value of the interest so retained by the government. If it were otherwise, and the right of the state to tax existed, such interest so retained in the public lands would, in many instances, be greatly impaired, if not wholly sacrificed. Few instances, if any, can be shown where this has been done or permitted, though instances are not wanting where the attempt to do so has not wholly failed. And since a decision recently made by the supreme court of the United States on a question precisely like this, arguments upon such questions in the inferior federal courts may as well be considered as closed. Would, then, the taxation of these lands, if permitted, in any way embarrass the government or impair the value of the interest retained in the lands? The right to tax the lands would necessarily carry with it the right to enforce the payment of the tax when an appropriate and adequate remedy should be provided by law. The usual remedy in such cases is by sale of the land when default is made in the payment. That is the remedy provided by law in this state for the payment of delinquent taxes on land. And when a proper revenue law is strictly complied with, and a sale of land for taxes takes place under it. the title of the purchaser becomes perfect. It is paramount to every other outstanding title, because of the fact that such title is derived from the sovereign power of the state. Were it otherwise, the whole proceedings, commencing with the assessment and ending with the recording of the treasurer's deed, would be a useless and idle ceremony, a cunningly-devised scheme concocted, I might say, to entrap, overreach and deceive the unwary. But I shall not be the first to ascribe any such injurious effect to our revenue laws, and if it is done at all, it must be done by a tribunal created by the constitution of this state, a thing which, I presume, we have at this time but little reason to apprehend. If these views be correct, then the right to tax carries with it and includes the right to sell the land for the non-payment of the tax, and the making of a perfect title to the land. This would impair and even totally destroy the interest retained in the land by the United States. This can not be done without overturning a long-established and well-settled principle, maintained by the government from its very foundation. It is claimed that the railroad is completed; that the company is entitled to patents for the land as soon as it shall elect to pay the land office fees and the cost of surveying, and that it ought to be compelled to receive patents for the same. But the bill alleges that the road is not completed as the law requires. This is probably correct, and, for this reason, the bill alleges, the government refuses to issue its patents for the land not already patented. The company is not bound to complete the road until the 1st day of July, 1876. And were the road now fully completed, there is no law or regulation of the interior department that would require the company to select the land, pay charges, etc., until it might suit the convenience of the company so to do. Certainly the company could not be required to do this before the time fixed by law for the completion of the road, and as that time has not yet arrived, it cannot be said that the company is yet in default. This may be a great misfortune to the people of the counties in which these lands lie, and to the people of the state generally. If so, it is the fault of the law-making power, by which alone the fault can be corrected and a remedy supplied. It follows from these views that the taxes levied upon the lands between the ten-mile limit and the twenty-mile limit are without authority of law. But there is another question raised by the argument of counsel for complainant, which strikes at the foundation of the alleged right of a state to tax any of the lands falling within the said grant.

This is nothing more nor less than a denial of the right of a state to provide for taxing any of the lands granted as aforesaid, until after they shall have been sold by the company. If the position assumed by counsel in this behalf be correct, then it necessarily disposes of the whole controversy growing out of the attempt to tax these

lands, and the efforts made to collect the taxes assessed thereon. This principle, if such it be, applies to the entire grant of lands made to the company, as well as the lands situated within, as without the ten miles limit. As the supreme court of the United States has recently spoken on this question, I shall content myself by adopting the language there used, more especially as I do not desire to add a single word to what was stated by that court. Most people would say without hesitation that when that high court speaks, the inferior federal courts ought to be silent. I fully recognize the propriety of this, and yield a ready obedience to what I regard a duty in the premises. In the case of Kansas Pac. R. Co. v. Prescott [16 Wall. (83 U. S.) 603], decided by the supreme court of the United States at its last term, the court says: "Another important and declared purpose of congress would be equally defeated by the title, thus acquired under the tax sale, if it were valid. It is wisely provided that these lands shall not be used by the company as a monopoly of indefinite duration. The policy of the government has been for years to encourage settlement on the public lands by the pioneers of emigration, and to this end it has passed many laws for their benefit. This policy not only favors the actual settler, but it is to the interest of those who, by purchase, own adjacent lands, that all of it should be open to settlement and cultivation. Looking to this policy, and to the very large quantity of lands granted by this statute to a single corporation, congress declared that if the company did not sell those lands within a time limited by the act they should then, without further action of the company, or of congress, be open to the actual settler under the same laws which govern the right of pre-emption on government lands, and at the same price. Any one who has ever lived in a community where large bodies of lands are withheld from use or occupation, or from sale except at exorbitant prices, will recognize the value of this provision. It is made for the public good, as well as for that of the actual settler. To permit these lands to pass under a title derived from the state for taxes would certainly defeat this intent of congress. It makes no difference in the force of the principle, that the money paid by the settler goes to the company. The lands which the act of congress declares shall be open to pre-emption and sale are withdrawn from pre-emption and sale by a tax title and possession under it, and it is no answer to say that the company which might have paid the taxes gets the price paid by the settler. For these reasons we think that though the line of the road had been built and approved by the president, so far as to authorize the company to obtain patent for this land, if they have paid the cost of survey and the expenses of making the conveyance, yet the neglect to do this and the contingent right of offering

the land to actual settlers at the minimum price asked for its lands by the government, forbid the state to embarrass these rights by a sale for taxes."

I have carefully read and re-read the opinion of the supreme court in the case referred to, and I have diligently sought, but I have sought in vain, to find one single feature in this case that would distinguish it from the questions discussed and decided in the case before referred to. Believing as I do, that the supreme court has decided the identical question raised in this case, in language so plainly forcible that I could not possibly hope to equal it, it becomes my duty to yield a ready obedience, and not only to follow the law when so declared, but to see that it is duly enforced when a proper application is made therefor. Without questioning the correctness of the principles established in said case, I am forced to the conclusion that the complainant is entitled to the injunction prayed for in the bill. Injunction allowed until the first day of the next term of the court, and until a hearing of the case can be had. The complainant, however, to file with the clerk of the court, in the usual form, a bond in the sum of $25,000, before the issuing of the injunction—security to be approved by the clerk.

[The cause came up for a final hearing, and a decree was rendered making the injunction perpetual as to the lands not patented to the company, and dismissing the bill as to the others. Case No. 14,382. Cross appeals being taken to the supreme court, the decision of the circuit court was affirmed. 22 Wall. (89 U. S.) 444.]